**DISTRICT COURT OF THE VIRGIN ISLANDS**

**DIVISION OF ST. THOMAS AND ST. JOHN**

**UNITED STATES OF AMERICA**

    v.

**JACQUES JEAN BAPTISTE,**

    **Defendant.**

_____

3:25-cr-00061-RAM-EAH

**TO:**    Denise George, Esq., AUSA
          Christopher Opiel, Esq.

## MEMORANDUM OPINION

**THIS MATTER** came before the Court on a bench trial held on January 20, 2026. Defendant Jacques Jean Baptiste was represented by Attorney Christopher Opiel, and the Government was represented by Assistant United States Attorney Denise George. The Government charged Mr. Jean Baptiste by Information with Illegal Entry by an Alien, in violation of 8 U.S.C. § 1325(a)(1). *See* Dkt. No. 13. At the conclusion of the bench trial, and after denying the Defendant's Motions for Judgment of Acquittal, the Court took the matter under advisement. For the reasons that follow, the Court finds that the Government met its burden of proving Mr. Jean Baptiste's guilt beyond a reasonable doubt and finds Mr. Jean Baptiste **GUILTY** on Count One of the Information, Illegal Entry by an Alien.

## BACKGROUND

### I.    Trial Testimony

At trial, the parties did not offer opening arguments. The Government presented four witnesses. It first called Richard Hughes, a Customs & Border Protection ("CBP") Officer who had been assigned to inspect passengers leaving from Cyril E. King Airport on St. Thomas, U.S. Virgin Islands. On August 7, 2025, he was working at the pre-departure section,

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 2

processing passengers traveling stateside. He testified that, when Mr. Jean Baptiste came to his booth, he asked for Mr. Jean Baptiste's passport, identification, and boarding passes. Mr. Jean Baptiste gave him his Haitian passport and his U.S. Employment Authorization Card. Officer Hughes looked through the passport to see if there was a visa or a stamp that Mr. Jean Baptiste had entered the United States officially. He indicated in the CBP system that Mr. Jean Baptiste needed to be examined further to ascertain his status in the United States. Officer Hughes sent him to secondary inspection, where the officers had more time to dig deeper into an individual's status to determine if a person was in the country legally. The Employment Authorization Card, Gov't Ex. 5, and the Haitian passport, Gov't Ex. 6, were admitted into evidence.

The Government next called Bernice Meristil, an Agriculture Specialist with CBP, who had attended the CBP Foreign Language Award Program where she had been tested for translating Haitian Creole and was certified, as part of her official duties, to translate for CBP. She stated she was fluent in Haitian Creole, as both of her parents spoke it, and she had spoken it since she was born. On August 7, 2025, she was working at Cyril E. King Airport and was called into the secondary inspection area to translate into Haitian Creole questions from a template that CBP Officer Tywanna Sprauve was asking Mr. Jean Baptiste and to translate his answers back into English for Officer Sprauve. Ms. Meristil sat next to Officer Sprauve, who was typing the answers into a computer; she saw that what Officer Sprauve typed was accurate. Based on her experience and knowledge, Ms. Meristil translated the entire interview accurately. She identified Gov't Ex. 1 as the seven-page written record of the

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 3

interview, and averred that it accurately reflected the verbatim translations she provided during the interview.[1]

On cross-examination, Attorney Opiel played sections of Gov't Ex. 8, a videotaped interview between Mr. Jean Baptiste and CBP agents taken after he had left secondary inspection and had been arrested, where Ms. Meristil also acted as an interpreter. The excerpts depicted Ms. Meristil looking up some words on Google Translate and appearing to

---

[1] Attorney Opiel raised a Motion in Limine before the bench trial began in which he objected to the admission of Gov't Ex. 1 because some of the questions asked and answers given by Mr. Jean Baptiste during that interview appeared to prompt inculpatory admissions and the CBP Officer had not given him any *Miranda* warnings. The Government cited a number of cases, such as *United States v. Long Tong Kiam*, 432 F.3d 524 (3d Cir. 2006), where a person seeking admission to the United States at the Philadelphia airport was questioned at secondary inspection and made inculpatory statements. The Third Circuit noted that an alien at the border "must convince a border inspector of his or her admissibility to the country by affirmative evidence." *Id*. at 529. Further, while an alien "is unquestionably in 'custody' until he is admitted to the country, normal *Miranda* rules simply cannot apply to this unique situation at the border." *Id*. The Court held that a CBP inspector will, at some point, have "sufficient information to make a determination regarding admissibility and will then decide whether to call in a criminal investigator," at which point "*Miranda* may then apply. If the inspector's questions objectively cease to have a bearing on the grounds for admissibility and instead only further a potential criminal prosecution, however, this line has been crossed." *Id*. at 530. The Court further explained that the defendant was not entitled to *Miranda* warnings before he made his first incriminating statements at the secondary inspection. But at the point where that inspector "ceased questioning about administrative admissibility and called in a criminal investigator, *Miranda* was implicated." *Id.* at 531 (citation omitted); *see also United States v. St. Vallier*, 404 F. App'x 651, 657 (3d Cir. 2010) ("[Q]uestions that bear upon both admissibility and criminal conduct, while not relating solely to prosecution of the latter, do not cross the boundary we articulated in *Kiam*."). This Court eventually ruled that the questions in Ex. 1 that elicited inculpatory responses from Mr. Jean Baptiste (such as that he did not have documents to lawfully be in the United States) were asked as part of the CBP Officer's administrative determination as to whether Mr. Jean Baptiste was admissible, and not for the sole purpose of criminal prosecution that would have required *Miranda* warnings. The Court opined that this did not bar admission of Gov't Ex. 1, but that Ms. Meristil was not the appropriate witness for the Government to use to admit that exhibit.

summarize some of Mr. Jean Baptiste's statements rather than repeating them verbatim. Attorney Opiel argued that this discrepancy went to Ms. Meristil's credibility. Upon further questioning, Ms. Meristil reiterated that she translated verbatim, that she had no issues in translating the first interview with Officer Sprauve, and the words that she looked up in the videotaped interview had to do with the text of the *Miranda* warnings that the CBP agent was administering to Mr. Jean Baptiste.

The next witness, CBP Officer Tywanna Sprauve, testified that she was working at Cyril E. King Airport on August 7, 2025 conducting secondary inspections. Mr. Jean Baptiste was referred to her for the purpose of verifying his immigration status. She asked him to fill out a general declaration form and, while he was doing so, conducted a number of systems checks on various databases. Among the databases Officer Sprauve checked were the Central Index System, which provided the benefits associated with a person's "A number"—an Alien Registration Number, used for tracking and processing immigration applications. The Claims database showed that Mr. Jean Baptiste had a pending application for asylum, and that his application for Temporary Protected Status ("TPS")—which allows persons from specified countries to remain in the United States without being deported—had been denied. The CCD, Consular Consolidated Database, showed that he had not been issued travel documents (such as a visa) to come into the United States. The ADIS, Arrival & Departure Information System, which recorded all crossings into and out of the country at ports of entry, showed negative. Officer Sprauve testified that Mr. Jean Baptiste's Employment Authorization Card was not sufficient to satisfy immigration requirements because the "A" number on the card

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 5

showed that he was not a U.S. citizen; while it permitted him to work here, the card did not indicate what allowed him to work in the United States. His passport showed that he had visas for two other foreign countries but no visa for the United States and no admission stamps showing that he was admitted into the U.S. If a person was admitted at the Virgin Islands, there would have been an admission stamp, and the person would be given a classification and a period of admission. People from Haiti required a visa to enter the United States.

Officer Sprauve noticed that Mr. Jean Baptiste was having difficulty filling out the form. She asked him what language he spoke, was told Haitian Creole, and asked Ms. Maristel to translate. Agent Sprauve proceeded to conduct a sworn statement to gather information about Mr. Jean Baptiste's identity, alienage, and admissibility. She typed out the question in the computer, Ms. Maristel asked Mr. Jean Baptiste the question in Haitian Creole, he responded, Ms. Maristel related the answer to her in English, and she typed the response in a Word document. Officer Sprauve signed the document, entitled Record of Sworn Statement in Administrative Proceeding (Form I-877). She testified it was a clear and accurate record of the questions and answers of the interview. Officer Sprauve printed out the document, Ms. Maristel read through it line by line to Mr. Jean Baptiste so if he had an objection, Officer Sprauve could change the text. Mr. Jean Baptiste then signed the document electronically with a stylus, which automatically placed his initials on every page of the seven-page document. Officer Sprauve added that once signed, the document became a pdf document such that the text was locked and could not be edited. Another CBP Officer signed as a

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 6

witness.

Exhibit 1 was admitted. Attorney George then highlighted the text of some of the questions and answers contained in that document by asking Officer Sprauve to read them on the record. Mr. Jean Baptiste stated that his country of citizenship was Haiti; that he first entered the United States on May 27, 2024 in St. John; that he came by boat from Dominica and paid $1,800 to be transported to the United States; he did not present himself for inspection to CBP on his arrival; he was aware the way he entered the country was illegal, and he never applied for a United States visa. *See* Ex. 1 at pp. 001, 003-006. The questions at the beginning and end of the form asked if he understood all of the questions asked that day (he did); whether he had any questions for the CBP Officer (he did not); and whether the statements he was about to make were true and complete (they were).

On cross-examination, Attorney Opiel pointed out that the initials indicated on each page of Gov't Ex. 1 were JJP, not JJB. Officer Sprauve responded that could have been a communication issue or the pad on which he placed his electronic signature did not print out the entire "B," but those were his initials "for sure." In response to a question whether she had reviewed all relevant documents related to Mr. Jean Baptiste's immigration status via the system checks, Officer Sprauve stated she reviewed what she saw—he had a pending I-589 (asylum application), had an I-765 (Employment Authorization Card), and TPS had been denied. She did not review his asylum application (a different agency did that). Asked whether there was a difference between TPS and Temporary Presence Authorized, she responded yes. She did not review any documents to see if he was granted Temporary

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 7

Presence Authorized. On redirect, Officer Sprauve noted that the Employment Authorization Card stated "not valid for reentry into the United States." It just allowed him to work and did not indicate any immigration status.

In response to Attorney Opiel's questions, these three Government witnesses stated that they first met Mr. Jean Baptiste on August 7, 2025, they did not know where he was located previously, and they did not witness him commit any crime on that day.

The final Government witness was Jodi Luntsford, the Director of USCIS's Field Office on St. Thomas. Her office addresses applications for immigration benefits (such as green cards, citizenship, asylum, work authorization) and keeps records. She testified that each individual has a unique Alien Number, which was similar to a Social Security Number, assigned by USCIS (U.S. Citizenship & Immigration Services). She explained how a person could apply for benefits, either online or by a paper application; they could also submit documents in addition to their applications via the online portal. Either the USCIS or an Immigration Court would determine whether an individual received asylum. She explained that a work authorization allowed a person to work legally in the United States while they waited for a decision on another benefit requested (such as asylum). TPS was a benefit, and the decision to grant or deny it was made by USCIS.

Director Luntsford testified that she was delegated by statute and the Code of Federal Regulations to certify records if they were needed in Court. In that regard, she had certified a 35-page sheaf of documents, presented as Gov't Ex. 18, as true copies of documents in Mr. Jean Baptiste's "A" file. *See* Gov't Ex. 18 p. 18-001 (Certification that the documents were

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 8

photocopies of USCIS records contained in Mr. Jean Baptiste's file). After Gov't Ex. 18 was admitted, Director Luntsford was asked about the documents. The first one, the Application for Employment Authorization, I-765, was filed electronically. It was signed on November15, 2024 and Mr. Jean Baptiste certified that all information was complete, true, and correct. It set forth his date of arrival in the United States, May 27, 2024, and place of arrival, Cruz Bay, St. John. Ex. 18, pp. 18-002 to 18-008. The file contained a receipt for his asylum application, received by USCIS on June 12, 2024. Ex. 18, p. 0010. The top of the receipt provided that "This notice does not grant any immigration status or benefit." *Id.* The folder also contained a copy of Mr. Jean Baptiste's TPS application which, Director Luntsford asserted, allowed individuals from designated countries to stay in the United States temporarily. The application, dated August 20, 2024, was not granted. Ex. 18, pp. 18-019 to 18-031. The TPS application also indicated that the date of Mr. Jean Baptiste's last entry into the United States was 5/27/24 and his place of entry was Cruz Bay, St. John. Ex. 18, p. 18-021.

On cross-examination, Director Luntsford stated that she did not know if a translator had helped Mr. Jean Baptiste fill out the documents. On both the Employment Authorization and TPS applications, Mr. Jean Baptiste checked a box stating that he could read and understand English. Ex. 18, pp. 18-005, 18-028. Director Luntsford did not believe she had met Mr. Jean Baptiste and did not know whether he could speak English.

The Government rested its case.

## II.   Motion for Judgment of Acquittal

Attorney Opiel moved for a Judgment of Acquittal pursuant to Fed. R. Crim. P. 29.  He

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 9

asserted that no Government witness observed Mr. Jean Baptiste enter the United States. The Information provided that he entered between 5/1/24 and 8/7/25, but a violation of 8 U.S.C. § 1325 occurs at the time the person enters the country, and there was no such date asserted. As to Gov't Ex. 1, Mr. Jean Baptiste stated in the interview on August 7, 2025 that he knew he came into the country illegally, but the Government had not shown that he knew he came into the country illegally on the date he actually arrived. Officer Sprauve said she did not review his asylum application or his Temporary Presence Authorized status. She admitted there could have been some miscommunication during the interview because Mr. Jean Baptiste put his initials as JJP rather than JJB when signing Exhibit 1, showing that the translation was unreliable. In addition, Mr. Jean Baptiste was unlawfully arrested and detained in violation of federal and Virgin Islands law because the offense was not committed in the presence of the officer, and no one saw him commit the offense. Under those circumstances a warrant was needed and no warrant was produced.[2] He urged that the

---

[2] Mr. Jean Baptiste was apparently officially arrested by CBP officers after the secondary inspection with Officer Sprauve concluded. Details of the arrest were not placed on the record. Illegal entry is a misdemeanor offense. *United States v. Laville*, 480 F.3d 187, 191 (3d Cir. 2007). Both federal and Virgin Islands law proceed under the "usual rule is that a police officer . . . may only arrest without a warrant one guilty of a misdemeanor if committed in his presence." *Carroll v. United States*, 267 U.S. 132, 156-57 (1925); *see also* 5 V.I.C. § 3562(1). In *Gonzalez v. United States*, 145 S. Ct. 529, 530-33 (2025), Justice Sotomayor, joined by Justice Gorsuch, in a statement respecting the denial of certiorari, discussed historical support for the "in-presence requirement" dating back to English common law and continuing through the founding of the United States "almost without exception." While several circuit courts have held that the Fourth Amendment no longer protects persons from warrantless arrests for misdemeanors committed outside an officer's presence, *see id.* at 531-32 (collecting cases), the Third Circuit has not ruled on the validity of the in-presence requirement under the Fourth Amendment. Because the Fourth Amendment "must provide *at a minimum* the

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 10

testimony should be stricken and that the Court grant a judgment of acquittal.

Attorney George opposed the motion, countering that the Government had proven each element of the § 1325 offense beyond a reasonable doubt. Mr. Jean Baptiste's sworn statements show he entered the United States in May 2024 in St. John, and he knew he entered unlawfully at a place not designated by immigration officials. At the Cyril E. King Airport secondary inspection, he produced no evidence of his lawful entry into the United States: there was no stamp in his passport and no visa. His passport and other document showed that he was a Haitian citizen. He had a temporary authorization for employment but nothing that authorized him to be in the country. He knew when he entered that he had done so illegally because he paid to arrive in St. John on a boat from Dominica. When he was asked if he had appeared before any port of entry at any time or place other than as designated by immigration officers, he said no. The systems checks would have shown that he entered

---

degree of protection it afforded when it was adopted," *Lange v. California*, 594 U.S. 295, 309 (2021) (emphasis in original), and because warrantless arrests of misdemeanants were generally prohibited for crimes committed outside of an officer's presence at the nation's founding, this Court questioned, in prior § 1325 cases, whether defendants' warrantless arrests were lawful under the Fourth Amendment. *See Sajous*, 2025 WL 2097261 at *2 n.1; *United States v. Santilmond*, No. 3:25-cr-35, 2025 WL 3012749, at *1 n.6 (D.V.I. Oct. 28, 2025). But because the defendants in those cases had not raised the issue, the Court did not consider whether the arrests were unlawful. Here, however, counsel did raise the issue. But he did so at the conclusion of the bench trial in the context of a Rule 29 argument. He never filed a pretrial motion challenging the purported illegal warrantless arrest, which is how and when such challenges are brought before courts. *See, e.g., United States v. McGrady*, No. 25-cr-80070, 2025 WL 2646476, at *7 (S.D. Fla. Aug. 14, 2025) (addressing argument that law enforcement violated Fourth Amendment by arresting defendant for a misdemeanor that occurred outside of their presence, without a warrant, and rejecting in-presence requirement for warrantless misdemeanor arrests under the Fourth Amendment). A motion to suppress must be made before trial. *See* Fed. R. Crim. P. 12(b)(3)(C).

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 11

legally. He knew how to enter countries properly, given the stamps from other countries in his passport. The Government requested that the motion be denied.

Attorney Opiel reiterated that the Government relied on a lack of documentation to show that Mr. Jean Baptiste must have entered the country illegally and stressed that the fact that Mr. Jean Baptiste knew on August 7, 2025 that his entry was illegal did not prove that he knew at the time of his actual entry that he was doing so illegally.

The Court clarified from the Government the date it was relying on for Mr. Jean Baptiste's illegal entry. Attorney George responded that the date of illegal entry was May 27, 2024. The Government also noted that the question of an illegal arrest was a suppression issue that should have been raised when Mr. Jean Baptiste was arrested, not at trial.

The Court denied the Rule 29 motion, finding that the Government had showed sufficient facts to weigh in assessing whether the Defendant committed the offense of illegal entry. Mr. Jean Baptiste was an alien as shown by his passport and the Exhibit 1 interview. That interview also provided a basis to conclude that there was sufficient evidence to show that Mr. Jean Baptiste entered the United States at a time or place other than as designated by immigration officers, and that the date specified that he did so was May 27, 2024.

The defense rested, calling no witnesses and offering no exhibits. It renewed its Rule 29 motion, the Government reiterated its opposition, and the Court denied the motion for the same reasons as previously articulated.

### III. Closing Statements

In closing, the Government asserted that it had proven each element of the offense.

Mr. Jean Baptiste was an alien. The systems checks at secondary inspection showed no evidence of lawful entry into the United States at any time or place as designated by immigration officers. He had an Employment Authorization Card that allowed him to work and a Haitian passport with no visa allowing him to enter the United States. He had a pending asylum application but that gave him no authorization to reside legally in the U.S. He did not enter the country at a designated port of entry as shown by his answer to the question in Exhibit 1. His statements in his benefit applications showed he entered the country on May 27, 2024. The Government has proved beyond a reasonable doubt that Mr. Jean Baptiste is guilty of the crime of unlawful entry.

Attorney Opiel incorporated his Rule 29 arguments into his closing, adding that the issues of the documents being written in English where there was a translation issue, the lack of documents showing whether Temporary Presence Authorized was granted or denied, all showed that the Government could not prove that Mr. Jean Baptiste committed the offense.

The Court took the matter under advisement.

## DISCUSSION

### I. The Offense of Illegal Entry

Title 8, Section 1325(a)(1) provides:

> Any alien who enters or attempts to enter the United States at any time or place other than as designated by immigration officers . . . shall, for the first commission of any such offense, be fined under title 18 or imprisoned not more than 6 months, or both[.]

8 U.S.C. § 1325(a)(1). The Immigration and Nationality Act ("INA"), of which 8 U.S.C. § 1325

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 13

is a provision, defines "alien" as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Immigration officer" is defined as "any employee or class of employees of the Service[3] or of the United States designated by the [Secretary of Homeland Security], individually or by regulation, to perform the functions of an immigration officer." 8 U.S.C. § 1101(a)(18). Virtually any DHS official whose duties relate in some way to immigration activities qualifies as an "immigration officer."[4]

In *United States v. Sajous*, No. 3:25-cr-00036, 2025 WL 2097261 (D.V.I. July 25, 2025), this Court confronted the fact that § 1325(a) was silent as to any *mens rea* requirement. The Court concluded that it was not a strict liability offense but that the presumptive intent that

---

[3] The INA was signed into law before DHS existed, when the Immigration and Naturalization Service, an agency in the Department of Justice, oversaw most immigration-related issues. Parts of the statute still refer to the Immigration and Naturalization Service, or "the Service."

[4] A separate regulation defines "immigration officer" to mean:

> the following employees of the Department of Homeland Security, including senior or supervisory officers of such employees, designated as immigration officers authorized to exercise the powers and duties of such officer as specified by the Act and this chapter I: aircraft pilot, airplane pilot, asylum officer, refugee corps officer, Border Patrol agent, contact representative, deportation officer, detention enforcement officer, detention officer, fingerprint specialist, forensic document analyst, general attorney (except with respect to CBP, only to the extent that the attorney is performing any immigration function), helicopter pilot, immigration agent (investigations), immigration enforcement agent, immigration information officer, immigration inspector, immigration officer, immigration services officer, investigator, intelligence agent, intelligence officer, investigative assistant, special agent, other officer or employee of the Department of Homeland Security or of the United States as designated by the Secretary of Homeland Security as provided in 8 CFR 2.1.

8 C.F.R. § 1.2.

attached to criminal charges, "knowing," applied to § 1325(a). *Id.* at *8. The Court held that the Government must prove that the defendant (1) is an alien; (2) who knowingly entered the United States at any time or place other than as designated by immigration officers

According to the Third Circuit's Model Jury Instructions (Criminal), a person acts knowingly if he

> acts voluntarily and intentionally and not because of mistake or accident or other innocent reason. This means that the government must prove beyond a reasonable doubt that the Defendant was conscious and aware of the nature of her actions and of the surrounding facts and circumstances, as specified in the definition of the offense charged." When considering whether a defendant acted "knowingly," the factfinder "may consider evidence about what the Defendant said, what the Defendant did and failed to do, how the Defendant acted, and all the other facts and circumstances shown by the evidence that may prove what was in [the Defendant's] mind at that time.

Third Cir. Model Crim. Jury Instr., § 5.02, https://www.ca3.uscourts.gov/model-criminal-jury-table-contents-and-instructions, last visited 1/22/2026 (citation modified); *see also United States v. Dixon*, 548 U.S. 1, 5 (2006) ("As we have explained, unless the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense.") (citation modified). Knowledge can be inferred by circumstantial evidence. *United States v. Curran*, 2025 WL 1577564, at *2 (3d Cir. June 4, 2025).

## II. Application

### A. Whether Mr. Jean Baptiste is an Alien

The first element of a § 1325(a)(1) violation that the Government must prove beyond a reasonable doubt is whether Mr. Jean Baptiste is an alien. As indicated above, the INA

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 15

defines an alien as "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). The evidence concerning this factor comes from multiple sources. Mr. Jean Baptiste presented a Haitian passport to Officer Hughes. It was entered into evidence as Gov't Ex. 6 and showed that he was a citizen of Haiti. At the interview with Officer Sprauve, translated by Ms. Meristil, Mr. Jean Baptiste responded to the question about his citizenship that he was a citizen of Haiti, and that "Record of Sworn Statement in Administrative Proceedings" was entered into evidence as Gov't Ex. 1. Mr. Jean Baptiste averred that every statement in Ex. 1 was true. Mr. Jean Baptiste's answer comports with Agent Sprauve's testimony in which she conducted systems checks from Department of Homeland Security databases showing that Mr. Jean Baptiste was not a citizen or Lawful Permanent Resident of the United States. Further, his Application for Employment Authorization that he had filled out under oath and was entered into evidence in Gov't Ex. 18, indicated that he was a citizen of Haiti and made no claim to being a citizen or Lawful Permanent Resident of the United States. Ex. 18-003, 18-011. Accordingly, the Government has proved beyond a reasonable doubt that Mr. Jean Baptiste is an alien, thereby satisfying the first element of § 1325(a)(1).

The Court rejects Defendant's argument that any issues Ms. Meristil may have had in translating during the videotaped interview Mr. Jean-Baptiste had with CBP Officers, where she used the services of Google Translate to translate some Creole words (that took place after the secondary interview with Officer Sprauve), made her translation of Ex. 1 unreliable—particularly where she reviewed the questions and answers with Mr. Jean Baptiste to ascertain if he had any changes or corrections and, when he did not, he signed the

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 16

document.

### B. Whether Mr. Jean Baptiste Knowingly Entered the United States at Any Time or Place Other Than as Designated by Immigration Officers

Mr. Jean Baptiste did not testify at trial, and therefore the Court has no direct evidence of his state of mind when he entered the United States on May 27, 2024—the date he swore on his applications for Employment Authorization and Temporary Protected Status was true and accurate. Gov't Ex. 18. Thus, the Court can rely only on circumstantial evidence as to whether he knowingly "enter[ed] . . . the United States at any time or place other than as designated by immigration officers[.]" 8 U.S.C. § 1325(a)(1). Given that "knowledge" can be proven by circumstantial evidence, *Curran*, 2025 WL 1577564, at *2, the Court finds that the record contains sufficient circumstantial evidence of Mr. Jean Baptiste's knowledge indicating his state of mind at the time of his May 27, 2024 entry.

In the Record of Sworn Statement in Administrative Proceedings, Gov't Ex. 1, Officer Sprauve asked Mr. Jean Baptiste where he traveled to when he left Haiti. He responded Dominican Republic and Dominica; that he presented his passport to an immigration officer when arriving in Dominica; that he left there in 2024 to come to the United States to work; that his date of entry was May 27, 2024 and he arrived on St. John by boat; he paid $1,800 to be transported to the United States; he did not present himself for inspection to a CBP Officer when he entered St. John on May 27, 2024; he is aware that the way he entered the United States was illegal; and he had never applied for a U.S. visa. Gov't Ex. 1 at p. 011-013. As Attorney Opiel pointed out, Mr. Jean Baptiste's response to the question about entering the country illegally was an admission as to his understanding as of August 7, 2025, the day he

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 17

was questioned, that he had entered illegally, and not an admission as to his knowledge on May 27, 2024. Nevertheless, it is reasonable to infer that Mr. Jean Baptiste understood on May 27, 2024 that he could not cross an international border without presenting required documentation and without speaking to and being given permission to enter by immigration authorities. If a person does not do so, it is also reasonable to infer that the person is seeking to avoid an encounter with those immigration authorities.[5] This inference is the stronger given Mr. Jean Baptiste's admitted mode of entry—by boat from Dominica, where he paid $1,800 to be transported. These facts contain all the indicia of a furtive entry into the country to avoid immigration authorities—particularly where the evidence shows that Mr. Jean Baptiste was aware of and followed the proper protocols for entry in a foreign country, Dominica. He admitted that when he arrived there, he presented himself to immigration authorities and had his passport stamped. Ex. 1, p. 00011. But once Mr. Jean Baptiste crossed the international border into St. John, he did not make any attempt to ensure that his entry was lawful by contacting any authorities and having his passport stamped. Rather, he remained in the United States unknown to the authorities until he filed an asylum application on June 12, 2024.

Moreover, the Department of Homeland Security databases that Officer Sprauve and Director Luntsford discussed during their respective testimonies contained no record of a

---

[5] As the Court observed in *Sajous*, 2025 WL 2097261, at *8 n.15, "an alien who entered the United States and then avoided all contact with immigration officials cannot claim that they did not know they needed to enter the country at a place designated as proper by immigration officers."

*United States v. Jean Baptiste*
3:25-cr-00061-RAM-EAH
Memorandum Opinion
Page 18

lawful entry into the United States or *any* entry at the United States border. As a result, Officer Sprauve determined that Mr. Jean Baptiste's entry into the United States was illegal, based on the absence of such a record. See United States v. Patel, No. 3:25-cr-0070, 2025 WL 3641863, at *4 (D.V.I. Dec. 16, 2025) (noting that all Department of Homeland Security databases searched by CBP agents contained no record of the defendant's entry at a designated port of entry and inspection by CBP officers, and that the absence of such records indicated that defendant's entry into the United States was illegal). And as made clear through the testimony of Officer Sprauve and Director Luntsford, the fact that Mr. Jean Baptiste received employment authorization and had a pending asylum application did not serve to grant him any immigration status or benefit: they did not retroactively legalize the illegal entry. All of these facts provide significant circumstantial evidence that Mr. Jean Baptiste knowingly entered the United States at a time or place other than as designated by immigration officers. As a result, the Court concludes that the Government proved this second element of illegal entry, 8 U.S.C. § 1325(a)(1), beyond a reasonable doubt.

## CONCLUSION

For the reasons set forth above, the Court hereby **FINDS** Mr. Jean Baptiste **GUILTY** of Count One of the Information, entering the United States at a time and place other than as designated by an immigration officer, in violation of 8 U.S.C. § 1325(a)(1).

ENTER:

Dated: January 22, 2026

/s/ Emile A. Henderson III
EMILE A. HENDERSON III
U.S. MAGISTRATE JUDGE